## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PEDRO SOTO,
    *Plaintiff,*

    v.                                            No. 3:19-cv-1968 (VAB)

DRT AEROSPACE, LLC
    *Defendant.*

### RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT

Pedro Soto ("Mr. Soto") filed this lawsuit against DRT Aerospace, LLC ("DRT") in Connecticut Superior Court, Judicial District of New Haven. Ex. D to Not. of Removal, ECF No. 1-4 (Nov. 14, 2019) ("Compl."). DRT removed the case to this Court on December 13, 2019. Not. of Removal, ECF No. 1 (Dec. 13, 2019) ("Not. of Removal").

Mr. Soto alleges that DRT breached its employment contract with Mr. Soto, breached the implied duty of good faith and fair dealing, and was unjustly enriched. *See* Compl. ¶¶ 10–19.

DRT has now moved for summary judgment. *See* DRT Aerospace, LLC's Mot. for Summ. J., ECF No. 38 (Sept. 3, 2021) ("Mot.").

For the following reasons, DRT's motion for summary judgment is **GRANTED** in part and **DENIED** in part**.**

Summary judgment will be denied as to Count One, but granted as to Counts Two and Three.

1

I.       **FACTUAL AND PROCEDURAL BACKGROUND**

    A.  **Factual Background**[1]

In 2007, Mr. Soto was hired by Space-Craft Manufacturing, a New Haven-based aerospace manufacturing company, and in 2011, he became its Chief Operating Officer. *See* Local Rule 56(a)2 Statement of Facts in Opp'n to Summ. J. at 1 ¶ 1, ECF No. 41 (Sept. 22, 2021) ("Pl.'s Rule 56 Statement").

In early 2016, DRT's predecessor-in-interest acquired Space-Craft Manufacturing and asked Mr. Soto to become a DRT employee. *Id.* at 2 ¶ 2.

As a precondition to the acquisition of Space-Craft Manufacturing, on January 29, 2016, Mr. Soto signed an employment contract. *Id.* at 1 ¶¶ 1, 4; DRT Aerospace, LLC's Statement of Undisputed Material Facts ¶ 1, ECF No. 39 (Sept. 3, 2021) ("Def.'s Rule 56 Statement"). The employment contract was drafted by DRT and Mr. Soto had limited opportunity to change the terms. *See* Pl.'s Rule 56 Statement at 2 ¶ 8.

Mr. Soto was initially a DRT plant manager at the New Haven facility. *See* Pl.'s Rule 56 Statement at 2 ¶ 4. In April 2017, Mr. Soto became a DRT account executive and the company moved to Meriden. *Id.* at 2 ¶ 5.

Mr. Soto resigned from DRT effective January 22, 2019, after providing two weeks' notice. *See id.* at 2 ¶ 4; Def.'s Rule 56 Statement ¶ 3. DRT has not provided Mr. Soto with severance pay. *See* Compl.

---

[1] The facts are taken from the Complaint, DRT's Local Rule 56(a) Statement, Mr. Soto's Local Rule 56(a) Statement, and supporting exhibits filed by both parties. *See* D. Conn. L. Civ. R. 56(a)(1) ("Each material fact set forth in the Local Rule 56(a)(1) Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)(2) Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact."). Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party. Each admission or denial must include a citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)(2), 56(a)(3).

**B. Procedural History**

On November 14, 2019, Mr. Soto filed this lawsuit against DRT in the Connecticut Superior Court at New Haven. *See* Compl.

On December 13, 2019, DRT removed the case to federal court on the basis of diversity jurisdiction. *See* Not. of Removal.

On December 19, 2019, DRT filed its Answer and counterclaims against Mr. Soto, alleging Mr. Soto breached his confidentiality and non-competition agreements with DRT and misappropriated trade secrets in violation of Connecticut General Statutes § 35-50 and the Defend Trade Secrets Act, 18 U.S.C. § 1836. *See* Answer and Counterclaim, ECF No. 7 (Dec. 19, 2019).

On January 1, 2020, Mr. Soto filed an Answer to DRT's counterclaims. *See* Answer and Affirmative Defenses to Counterclaim, ECF No. 8 (Jan. 10, 2020).

On December 8, 2020, Mr. Soto and DRT filed a stipulation of dismissal without prejudice of DRT's counterclaims against Mr. Soto. *See* Stipulated Dismissal of Counterclaims Without Prejudice, ECF No. 32 (Dec. 8, 2020).

On September 3, 2021, DRT filed a motion for summary judgment, memorandum of law in support, and Rule 56 statement of facts. *See* Mot.; Def.'s Rule 56 Statement.

 On September 22, 2021, Mr. Soto filed an opposition to DRT's motion for summary judgment, as well as a memorandum of law in support and a Rule 56 statement of facts. *See* Pl.'s Opp'n to Summ. J., ECF No. 40 (Sept. 22, 2021) ("Opp'n"); Pl.'s Rule 56 Statement.

On October 6, 2021, DRT filed a reply in support of its motion for summary judgment. *See* DRT Aerospace, LLC's Reply in Supp. of Mot. for Summ. J., ECF No. 42 (Oct. 6, 2021) ("Reply").

## II.    STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis in the original).

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated

speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [his] favor." *Gary Friedrich Enters., LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

## III. DISCUSSION

### A.  The Breach of Contract Claim

As a court sitting in diversity jurisdiction, this Court is bound to apply state law. *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013); *see also Roberts v. Amica Mut. Ins. Co.*, No. 3:14-CV-1589 (SRU), 2015 WL 7458510, at *3 (D. Conn. Nov. 24,

2015) ("Because this is a diversity suit based on a state law contract action, the court must apply Connecticut substantive law."). The terms of the employment contract state that it shall be "construed and enforced in accordance with[] the laws of the State of Ohio," and therefore, Ohio state law applies. Ex. A to Ex. 1 to Def.'s Rule 56 Statement of Facts at 4, ECF No. 39 (Sept. 3, 2021) ("Emp. Cont."); *see also Deutsch Inc. v. Sherwin-Williams Co.*, 828 F. App'x 58, 59 (2d Cir. 2020) (noting that "[b]y its terms, the [c]ontract is governed by Ohio law" and therefore applying Ohio state law to interpret its terms).

Under Ohio contract law, there are "primary interpretive rules and secondary interpretive rules." *Sutton Bank v. Progressive Polymers, LLC*, 163 N.E.3d 546, 552 (Ohio 2020). As part of the primary interpretive rules, courts should "give effect to the intent of the parties," as expressed in "the language of the contract." *See Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *See Deutsch*, 828 F. App'x at 59 (quoting *Davis v. Loopco Indus., Inc.*, 609 N.E.2d 144, 145 (Ohio 1993)).

"[T]he words used [in the contract] should be read in context and given their usual and ordinary meaning." *Id.* (quoting *Carroll Weir Funeral Home, Inc. v. Miller*, 207 N.E.2d 747, 749 (Ohio 1965)); *see also Hope Acad. Broadway Campus v. White Hat Mgmt., LLC*, 46 N.E.3d 665, 674–75 (Ohio 2015) ("Common words in a contract are given their plain and ordinary meaning, unless another meaning is clearly evident from the face or overall content of the contract, or unless the result is manifestly absurd."); *see also Sutton Bank*, 163 N.E.3d at 552 ("Common words . . . will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents." (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146 (Ohio 1978))).

Secondary interpretive rules "do not operate unless the primary rules of interpretation fail to resolve the contract's meaning" because "the contract language is reasonably susceptible of two different interpretations." *Sutton Bank*, 163 N.E.2d at 552 (citing *Malcuit v. Equity Oil & Gas Funds, Inc.*, 610 N.E.2d 1044 (Ohio Ct. App. 1992)). Secondary interpretive rules include "that a contract provision should be strictly construed against one party and liberally construed in favor of the other" due to "inequality in bargaining power, or the fact that one party is the drafter and the other is not." *Id.*

The employment contract includes the following severance-related provisions:

> 2. Term. Employee's employment under this agreement will be for two (2) years beginning on February 1, 2016 and ending on January 31, 2018 (the "Term"). In the event of termination of Employee's employment under this Agreement, during the Term, by Employer without Cause (as defined in Section 11.1) or by Employee, during the Term, with Good Reason (as defined in Section 11.3) and whether or not there is a Change in Control, Employee shall be entitled to receive base compensation as provided in Section 3 below, payable in accordance with Employer's regular payroll practice, for a period equal to the remainder of the Term. At the end of the Term, Employee's employment will be "at will," meaning that either Employer or the Employee may terminate the employment relationship at any time, with or without notice and with or without cause.

Emp. Cont. at 1.

> 3.2 Benefits. Employee will be entitled during the term of his employment to participate in any employee benefit plans provided by Employer to its similarly situated employees for so long as Employer provides such benefit plans and to the extent that Employee is qualified under the requirements of the applicable benefit plan. This includes: (i) the Employer's incentive compensation plan, under which Employee may earn up to an additional 20% of his Base Compensation, subject to the achievement of certain quantitative and qualitative goals, and (ii) six months' severance pay unless terminated for Cause, to be paid bi-weekly with Employer's standard payroll.

*Id.*

DRT argues that the contract unambiguously states that Mr. Soto only gets severance pay if he resigns during the course of the "Term" defined by the contract as February 1, 2016 to January 31, 2018. *See* Mot. at 5–6. DRT argues that after January 31, 2018, Mr. Soto's employment became "at[-]will," as described in Section 2 of the employment contract. *Id.* at 6. Mr. Soto resigned from DRT almost a year later, on January 22, 2019, and therefore, DRT argues, he is not entitled to the six-months' severance pay because, at that point, Mr. Soto was an at-will employee, not an employee under the Term of the employment contract. *Id.* at 6. DRT emphasizes that this interpretation "is not manifestly absurd" because the "severance payment acted as a penalty against DRT if DRT terminated [Mr.] Soto's employment during the [T]erm for any reason other than those listed." *Id.*

In response, Mr. Soto contends that the employment agreement does not use the word "only" in relation to the severance pay he would have received if he had resigned during the defined two-year Term of the employment contract. Opp'n at 1. Mr. Soto also argues that the contract uses the word "Term" when discussing the two-year Term of the employment contract but uses the phrase "during the term of his employment" when referring to the longer total term that encompassed any at-will employment. *Id.* at 6. Mr. Soto argues that he was entitled to severance pay even though the two-year Term had expired because Section 3.2 refers to the broader "term of employment." *Id.*

In response, DRT argues that there are not two separate terms in the agreement and that any mention of the word "term," capitalized or not, in the employment contract is "unambiguously defined" as February 1, 2016 to January 31, 2018. *Id.*

The Court disagrees.

"The intended meaning of any part of the parties' contract should be determined in light of the whole contract." *See EnQuip Techs. Grp. v. Tycon Technoglass*, 986 N.E.2d 469, 475 (Ohio App. Ct. 2012) (citing *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 678 N.E.2d 519 (Ohio 1997)). Terms in a contract should generally be given their ordinary meaning, however, "when parties to a contract have given a word a specific meaning by expressly defining it in the contract, that definition will generally override" the ordinary definition. *Sutton Bank*, 163 N.E.3d at 553. "[W]hen the parties clearly did not intend [that] express definition to apply, a court cannot force that construction upon them." *Id.* at 553 (citations omitted).

The employment contract defines "employment under th[e] agreement [to] be . . . two (2) years beginning on February 1, 2016 and ending on January 31, 2018" and expressly refers to this period as the capitalized "Term." Emp. Cont. at 1. After the two-year Term is defined, the capitalized "Term" is used in Section 2, as well as other sections of the contract, to refer specifically to that two-year period. *Id.* at 1; *see also id.* at 3 ("(ii) Employee's base compensation for the remainder of the Term.").

Elsewhere in the employment contract, however, a lowercase "term" is used. *See, e.g.*, *id.* at 2 ("At the end of the term of his employment or at any time upon Employer's request . . . .). Where the lowercase term is used, the surrounding language in the employment contract refers to a broader term of employment than that defined in Section 2. For example, in Section 5, the employment contract states that "[a]t the end of the term of his employment," the "Employee will deliver to Employer all of its property then in Employee's possession or control." *Id.* This Section appears to refer to the termination of any employment relationship, including any at-will employment, because even at-will employees presumably need employer-issued property to

continue doing their job. *See Sutton Bank*, 163 N.E.3d at 553 ("[W]hen the parties clearly did not intend [that] express definition to apply, a court cannot force that construction upon them.")

Additionally, the employment contract defines other terms, such as "Employer" and "Employee," with capital letters and continues to use that format throughout the document. *See id.* at 1 (defining DRT as the Employer and Mr. Soto as the Employee); *see also id.* at 2 ("Employer will pay or reimburse the Employee for all reasonable travel."); *id.* at 3 ("Employee's obligations pursuant to Section 4 will survive the termination of Employee's employment with Employer."); *id.* at 4 ("'Good Reason' for termination by Employee of his employment shall mean the occurrence (without Employee's express written consent) of any one of the following acts . . . ."). Therefore, Mr. Soto's interpretation, that "Term" and "term" are defined differently, is consistent with the use of capitalized defined words in other areas of the contract. *See Brown v. Drapp*, No. 14541, 1995 WL 170437, at *2 (Ohio Ct. App. Feb. 17, 1995) (finding a particular interpretation to be reasonable where the "interpretation [was] consistent with the remainder of the contract").

Therefore, "constru[ing] the evidence in the light most favorable to" Mr. Soto and "draw[ing] all reasonable inferences in [his] favor," *Gary Friedrich Enters.*, 716 F.3d at 312, as the Court must, the contract unambiguously refers to two different terms of employment, the defined "Term" from February 1, 2016 to January 31, 2018, and the "term of . . . employment" that encompasses the entire period of employment, including any time Mr. Soto was an at-will employee.

Mr. Soto next argues that the employment contract includes two separate amounts of severance pay, depending on whether he was terminated during the initial two-year Term or was terminated during the period of at-will employment. Opp'n at 4. Mr. Soto argues that if he had

resigned during the two-year Term of employment, he would have been entitled to the unpaid salary for the remaining period of the two-year Term as severance pay. *Id.* at 3–4 (giving the following example: "[i]f Mr. Soto had worked for only the first three months of the two-year contractual 'Term' of employment, and if DRT then terminated him without cause, he would have received severance of one year and nine months of base compensation[.]"). To support this argument, Mr. Soto points to language in Section 2 of the employment contract, which states if DRT terminated Mr. Soto's employment without cause during the initial two-year Term, or if Mr. Soto resigned during the two-year Term for good reason, as defined elsewhere in the contract, he would receive severance pay "for a period equal to the remainder of the Term." *Id.* Mr. Soto also argues that if he resigned after the employment relationship changed to at-will employment, he would have only received six months' salary as severance pay. *Id.* To support this argument, Mr. Soto points to language in Section 3.2, which states the "Employee will be entitled during the term of his employment" to receive "six months' severance pay unless terminated for Cause." *id.* at 4–5. Thus, Mr. Soto argues, the language of the employment contract indicates that there are two different severance pay amounts, depending on whether the employee resigns during the initial Term or during a period of at-will employment. *Id.* at 5.

In response, DRT argues that Sections 2 and 3.2 of the employment contract do not create separate severance pay amounts. Reply at 3–4. More specifically, DRT argues that the language in Section 2, which states "for a period equal to the remainder of the Term," means that the severance pay would be made in multiple installments during the remainder of the two-year Term. *Id.* at 4. DRT states that the six-months' severance pay in Section 3.2 is the only severance pay contemplated by the employment contract and only applies under the terms set out in Section 2. *Id.*

11

The Court disagrees, in part.

Under Ohio law, "where the terms in an existing contract are clear and unambiguous, [a] court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander*, 374 N.E.2d at 150. A contract is unambiguous "[a]s a matter of law, . . . if it can be given a definite legal meaning." *Martin Marietta Magnesia Specialties, LLC v. Pub. Util. Comm.*, 954 N.E.2d 104, 110 (Ohio 2011) (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)). A contract is ambiguous, however, "when it is susceptible to more than one reasonable interpretation." *Michael A. Gerard, Inc. v. Haffke*, No. 98488, 2013 WL 267296, at *2 (Ohio Ct. App. Jan. 24, 2013) (citing *City of Hillsboro v. Fraternal Ord. of Police, Ohio Lab. Council, Inc.*, 556 N.E.2d 1186 (Ohio 1990)).

The parties have offered competing, reasonable interpretations of the material phrases defining the amount of severance pay applicable to Mr. Soto. The parties' interpretations both account for the pertinent information related to severance pay, such as amount, timing of payments, and applicability. *See Career & Tech. Ass'n v. Auburn Vocational Sch. Dist. Bd. of Educ.*, No. 2013-L-010, 2014 WL 1478838, at *3 (Ohio Ct. App. Apr. 14, 2014) ("[A] contract provision is ambiguous where one could reasonably find it is susceptible to two or more reasonable interpretations because a material phrase in the provision is undefined." (citing *Euclid Asphalt Paving Co. v. Mount Zion Fellowship Church*, No. 2004-L-175, 2005 WL 3610463, at *3 (Ohio Ct. App. Dec. 29, 2005))). Therefore, the employment contract's provisions concerning the amount of severance pay due in Mr. Soto's circumstance are ambiguous and the Court must next consider extrinsic evidence of the parties' intent.

"Extrinsic evidence is admissible to ascertain the intent of the parties when the contract is unclear or ambiguous, or when circumstances surrounding the agreement give the plain language

12

special meaning." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996) (citations omitted). This is particularly true "when circumstances surrounding an agreement invest the language of the contract with a special meaning, [because] extrinsic evidence can be considered in an effort to give effect to the parties' intention." *Martin Marietta Magnesia Specialties*, 954 N.E.2d at 111. Extrinsic evidence can include "(1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Lutz v. Chesapeake Appalachia, LLC*, 71 N.E.3d 1010, 1012 (Ohio 2016) (quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio Ct. App. 1998)).

Mr. Soto argues that extrinsic evidence demonstrates that summary judgment is inappropriate. *See* Opp'n at 7–11. More specifically, Mr. Soto states that when he signed the employment contract, he believed the severance pay attached to the two-year Term was intended to protect him from being fired without cause and protect DRT from Mr. Soto resigning without good reason. *Id.* at 8. Additionally, Mr. Soto states that he believed that his right to severance pay would continue after the two-year Term as part of his entitlement to continued participation in the incentive compensation plan that is included in Section 3.2 of the employment contract. *Id.* at 9. Mr. Soto believed that the six-months' severance pay was intended to be a "reward for continued service with DRT, even if he was employed on an at-will basis" and that the severance pay "would help offset the fact that he would still be subject to a two-year noncompete provision[] after the initial [two-year] 'Term.'" *Id.*

DRT has not provided any extrinsic evidence of intent because it contends that extrinsic evidence is inappropriate at the summary judgment phase. *See* Reply at 2 ("If the Court finds that

the disputed contractual language is ambiguous, then the interpretation of the parties' intent constitutes a question of fact and Count One must be tried" (citing *Lewis v. Mathes*, 829 N.E.2d 318, 323–24 (Ohio Ct. App. 2005)). DRT also contends its interpretation of a single severance amount is reasonable because the "severance payment acted as a penalty against DRT if DRT terminated [Mr.] Soto's employment during the [T]erm for any reason other than those listed." Mot. at 6.

The Court disagrees, in part.

"Ordinarily, summary judgment is inappropriate when contractual language is ambiguous, because a question of fact remains. But if the extrinsic evidence demonstrates that no genuine issue of material fact exists, we conclude that summary judgment may still be appropriate." *Lewis*, 829 N.E.2d at 325 (internal citations omitted). Therefore, extrinsic evidence of intent can be appropriate at the summary judgment stage of a case.

Nevertheless, although Mr. Soto has provided extrinsic evidence describing his intent and understanding of the severance provisions, DRT has declined to provide extrinsic evidence of its intent and understanding of the severance provisions or extrinsic evidence to contradict Mr. Soto's evidence, and therefore, the intent and meaning of the severance provision should be resolved by a finder of fact, not by this Court at this stage of the case. *See Anderson*, 477 U.S. at 250 ("The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably by resolved in favor of either party.").

Accordingly, DRT's motion for summary judgment will be denied as to Count One.

**B. The Implied Covenant of Good Faith and Fair Dealing Claim and Unjust Enrichment Claim**

In his opposition brief, Mr. Soto states that he "does not challenge DRT's arguments as to Counts Two and Three." Opp'n at 1 n.1.

Accordingly, the Court will grant DRT's motion for summary judgment as to Counts Two and Three.

## IV.   CONCLUSION

For the foregoing reasons, DRT's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

Summary judgment will be denied as to Count One, but granted as to Counts Two and Three.

**SO ORDERED** at Bridgeport, Connecticut, this 23rd day of September, 2022.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE